HARRY E. McCOOL AND ANOTHER v. JAMES C. DAVIS.[1]

March 13, 1925.

No. 24,416.

**Second verdict does not cure defect in proof.**
1. A second verdict in his favor cannot make good a defect of proof in the case of the party having the burden of proof.

**Defect in proof remedied on second trial.**
2. The record examined and *held* to support the second verdict for plaintiff, a defect of proof existing on the first appeal having been remedied at the second trial.
*Headnote 1. See Appeal and Error, 4 C. J. p. 869, § 2845 (1926 Anno).
Headnote 2. See Railroads, 33 Cyc. p. 1381.

After the former appeal, the case was tried before Grannis, J., and a jury which returned a verdict in favor of plaintiffs. From an

[1]Reported in 202 N. W. 900.

order denying his motion for judgment notwithstanding the verdict or for a new trial, defendant appealed.  Affirmed.

*Baldwin, Baldwin, Holmes & Mayall,* for appellant.

*Lathers, Hoag & Lacy, James Manahan, Fesenbeck & Yetka* and *Arnold, Hollister & Arnold,* for respondents.

STONE, J.

This case has been here before and is reported in 158 Minn. 146, 197 N. W. 93.  We then reversed an order denying a new trial because, to a majority of the court, there seemed to be a defect of proof, one however possible of being made good on another trial. In consequence, the case was returned for a new trial.  The result is another verdict for plaintiffs, followed by a motion on behalf of defendant for judgment notwithstanding the verdict or for a new trial.  This appeal is from the denial of that motion.

Before proceeding to the merits of the case, it is well for us to say, in view of a misconception indicated by the memorandum accompanying the order appealed from, that if the present record were the same in substance as that presented on the first appeal, there would be a reversal with directions for judgment for defendant notwithstanding the verdict.  The decision before to the effect that the record then presented did not make out a case for plaintiffs, is the law of the case, and would control the result if the same record, or one substantially the same, were again before us.  A second verdict is not a substitute for a fatal defect of proof in the case of the party having the burden of proof.  Swenson v. Erlandson, 86 Minn. 263, 90 N. W. 534, and cases cited.

That is not the case, however.  At the second trial all of the testimony of the first was read to the jury under a stipulation giving that reading the same effect as would have attended the calling of the witnesses whose testimony was thus read.  Additional witnesses were called, most of them new to the case.  This testimony constitutes a new record of 1275 pages.  Our problem has been to determine whether the case for plaintiffs, now resting upon the old record plus the new and the verdict and refusal of a new trial, is successfully fortified against the argument that plaintiffs have not

proved, in a measure conforming to legal standards, that their residence property in Woodland, a northerly suburb of Duluth, was destroyed (at about 7 p. m. on Saturday, October 12, 1918), by a fire set a few days previously by a Great Northern locomotive at Mile Post 62, approximately 29 miles due west of Woodland.

Defendant's argument again is that plaintiffs' proof fails of its purpose because it leaves the Mile Post 62 fire in the realm of conjecture as an agency of causation. For reasons hereinafter indicated, we cannot now agree with that argument and are of the opinion that the verdict must stand and the order appealed from be affirmed. The case, as then viewed by a majority of the court, is comprehensively stated by the Chief Justice in the former opinion, to which reference must be made for an understanding of this decision. The map accompanying the former opinion is also a necessary aid to an understanding of this one.

We have never been in any doubt concerning the sufficiency of plaintiffs' proof that the "big fire" (the one originating at Mile Post 62 will be so referred to for convenience), left the point of its origin before 2 p. m. on October 12 with a running start on its course of destruction, and that it proceeded in a course somewhat south of east to the region of "Five Corners," at the corner common to sections 17, 18, 19 and 20 in township 50-15. That is nearly 10 miles west of southwest of plaintiffs' residence. Between Five Corners and Woodland, so far as the big fire was concerned, it was the opinion of a majority of the court on the former appeal that there was such a doubt left by the evidence that plaintiffs' case, for the time being, rested upon conjecture and mere possibility and that the verdict could not stand.

Speaking for myself, I could not then escape the conclusion that fires coming from the northwest, or west of northwest, including the Caribou lake and Rice lake regions, were more likely the cause of the destruction of Woodland than the big fire. With respect to that phase of the situation, the new record presents a marked change to be hereinafter referred to.

Without now going into detail, we are of the opinion that the evidence, particularly that in the new record, sustains the verdict

at all points, including the tracing of the big fire from Five Corners to Woodland. Many of the new witnesses were called from the territory between the two points in question. Some of them came from the northeasterly portion of Herman township (50-15); others appeared from sections 7, 8 and 18 in township 50-14, just south of the Norman Dairy and southeast of the county Work Farm. Others came from the region just north of there and several were from Woodland itself and the immediate vicinity of plaintiffs' premises. The testimony permits the conclusion that the big fire got to Five Corners anywhere from 4:30 to 6:00 o'clock, depending on how the testimony is considered with respect to the time element, and proceeded thence northeasterly to Woodland. This implies a change in wind direction from west or slightly north of west to south of west. There is testimony that such a change took place in time to carry the fire to the locality immediately north of plaintiffs' home from which it could have been carried to that residence by the admitted sudden wind shift to the north at about 7 p. m.

There is another aspect in which the new record, viewed as the jury were at liberty to view it, changes the situation to the detriment of defendant. That is the proof tending to eliminate other fires, not of railroad origin, as agencies of causation.

For example, there is testimony, and it is not all new, that there was no fire north of the St. Louis river, just across from Mile Post 62, until some hours after the big fire had left that point. This testimony would have enabled the jury to eliminate any fire coming from the region in question, north of the St. Louis river, from further consideration. They could have considered that the fire, if any, from this territory did no more than join with and become swallowed up by the big fire at some undetermined point in the area south of Grand Lake.

In the same manner the rather substantial fires south of Sunset lake and west of Grand lake could have been considered at the worst, as nothing more than delayed contributors to the holocaust wrought by the big fire.

Farther east is what may be referred to as the Caribou lake and Rice lake region. Reference to the map will indicate what is meant.

The northern limit of this fateful Saturday's destruction, in this area, extended in an irregular line from the north shore of Caribou lake to the south shore of Rice lake. The zone between this line' on the north and Grand lake and Pike lake on the south was burned over, so far as the record shows, by a fire probably not of railroad origin. In any event, this opinion assumes that to be the fact. But this fire, it now appears, came on its way too late, at least there is now ample room for that inference, to have beaten the big fire to Woodland.

Briefly, these are some of our reasons for concluding that the verdict for plaintiffs, as now supported, should not be disturbed. There are other considerations, some of them general and some particular and limited to details, which might be gone into. But any extended treatment would unduly prolong discussion. That some of us feel the facts to be otherwise than as found by the jury does not entitle us to nullify their determination. They were not impressed, at least not to the point of being controlled, by the fact that the northwest wind which in Hall v. Davis, 150 Minn. 35, 184 N. W. 25, was successfully shown to have carried the big fire from Mile Post 62 to Cloquet has now become first a west and then a southwest wind capable of taking the same fire to Woodland. There may be merit in the argument that this timely wind shift had its source only in the mind of witnesses. But this and other arguments for defendant do not permit us to say that there is not, as a matter of law, enough evidence to sustain the verdict.

Those of us who share in this view are sensible of the ease with which a fact argument can be made contra. By referring to selected testimony and assuming its truth, particularly as to time, it is easy to come to the conclusion that the big fire never got to Woodland. (That is my conclusion on the facts.) That argument, however, cannot escape the stubborn fact that there is other evidence in opposition and supporting the conclusion that it was the railroad fire that destroyed Woodland. There is testimony which, summed up, takes the big fire to Woodland. There is also ample support for a contrary conclusion. The issue was for the jury.

An illustration of some minor but important conflicts between witnesses is the story, of some, that there was fire at Calvary Cemetery at a much earlier hour and of others, that there was no fire there at all as late as 6 p. m. Several witnesses now testify that the fire came to Woodland from the southwest and not from the northwest. The testimony is conflicting also concerning the smaller fires and their activitiy. Some witnesses testified that a certain fire was out of control—others that it was out or under control.

It was for the jury to say whether the big fire was impelled by an initial draft not possessed by any of the others. That is so because of its kindling and first fuel supply, consisting of the accumulation of dry debris and hundreds of carloads of forest products at Mile Post 62. A few miles farther east, the main advance of this fire may have been relayed on by another large yard of cordwood— hundreds of cords of it. To what extent the gale of that afternoon was fire created, we cannot tell. That the big fire made a draft of its own, with a powerful traction, goes without saying. The "mighty march" of flame was probably not on an even front. It might have gone forward at times in separated columns which ultimately joined with each other or with fires of different origin. Again, "throwovers" from such a fire, carried by its own draft, independently of the wind, might, and in this case undoubtedly did, set fires far in advance of the main sweep of the flames. There is testimony to that effect.

Independently of the fire-created gale, whatever it was, there was a strong wind. Any fire would have been dangerous, but any ordinary fire could not have the initial impetus of that starting from Mile Post 62. It is entirely possible for that fire to have acquired, at the start, a speed and sweep which would explain a phenomenon the testimony presents, that of other fires, some innocuous and some dangerous, absolutely swallowed and lost in the irresistible and far flung charge of flame from the west and southwest—the so-called big fire.

A final and important consideration is that this verdict, unlike the first, as to the sufficiency of its evidentiary basis, has the unqualified approval of the learned trial judge. That element was largely

absent when the case was first here. The approval of the first verdict by the trial judge was of an exceedingly questioning and critical character, and properly so. While we are not controlled in this or any other case by the views of the trial judge, we are always vastly aided by the expression of them. It not only helps our review, but lends to the result an assurance, seldom to be had from any other source, which makes us more certain of serving the law and accomplishing justice.

The assignments of error with respect to rulings at the trial have received consideration and we find in them nothing justifying, at this stage of the case, a reversal.

Order affirmed.

WILSON, C. J. (dissenting.)

I cannot concur in the result reached. The evidence in this case, in my judgment, does not warrant the inference that the loss, in fact, resulted from the railroad fire. The legal identification of the destructive fire has not been established.

There is some testimony which now shows that when the railroad fire, in its southeasterly course, reached the vicinity of Munger, at about 5:20 p. m. or in the vicinity of the Five Corners, 4 miles to the east, the wind changed to the northeast. The former opinion discloses several other fires located to the northeast and ahead of the railroad fire as it started to the northeast.

In the prior opinion it was said the evidence was sufficient to justify the jury in finding that the fire on the north side of the river at Mile Post 61 came from the railroad fire. Now, the record forbids such a conclusion, as the testimony conclusively shows the existence of several distinct fires across the river from Mile Post 62 and to the north and northwest which is undoubtedly the source of the Thorwall fire. This fire together with numerous other fires made up the conflagration along the northern flank of the railroad fire and embracing the region of Grand lake, Seville road and possibly a portion of the region between Caribou lake and Pike lake. This fire crossed the Cloquet river about 1½ hours before the railroad fire crossed the St. Louis river which necessarily put

it considerably ahead of the latter. This fire traveled in its easterly course in a wind coming from somewhat north of west. There were about 40 stray and independent fires east of the Cloquet river and in the burned area. Among these were: Sunset lake fire, section 7-51-17; Reno fire, section 8-51-17; Bohnsock fire, section 27-51-17; stray fire, section 26-51-17; stray fire crossing railroad in section 36-51-17; the Dahl fire along the east line, section 32-51-16; the Clement fire was seen near the middle of section 33-51-16 between 3 and 3:30 on the day of the fire; the Munson fire was in section 34-51-16; heavy smoke was observed in section 2-50-16; the Mauser fire in section 1-50-16 was thought to be under control, but sparks were falling on this section at 4:10; there were fires in sections 13 and 16-51-16; there were fires in sections 1, 2, 3, 5, 7, 11, 15, 16 and 18-51-15; there were fires in sections 2, 6, 27, 31 and 35-51-15; the city of Duluth was under a heavy smoke all forenoon—before the railroad fire started; there were 8 fires within a radius of 4 miles of plaintiffs' residence and all but two of these were north of their home.

The Kimball and Clark homes on section 12-50-15 burned about the same time that plaintiffs' home burned. Yet plaintiffs' home is 4 miles east and 1½ miles north. These two homes were in the path of the railroad fire as it is said to travel northeast, but I cannot understand how it can be said that this fire would go to the northeast and then southerly to plaintiffs' premises so that they would be burning at the same time. This home is 23 miles from the St. Louis river crossed by the fire at 3:30. The railroad fire did not travel over 6 miles per hour. The improbability of the railroad fire, which upon the record may have burned the two homes mentioned, burning plaintiffs' home is apparent. But stranger still is the fact that at 6 o'clock the Norman Dairy burned. It is located from a mile to 1½ miles north of east from the Clark and Kimball homes and almost in a straight line toward the McCool home. Fire was seen at the Dairy farm at 5 o'clock coming from the west 100 feet high. Obviously this is not the railroad fire that traveled northeast to the Clark and Kimball homes. The fire, consuming the Norman Dairy, traveled east and crossed the territory which it is

claimed the railroad fire, traveling to the northeast, crossed an hour or so later. If the railroad fire reached this burned-over area, blackened by the Norman Dairy fire, there was necessarily a lack of fuel for its progress. The fire coming from the west to the Norman Dairy came near or over the Work Farm comprising the most of sections 1 and 2-50-15. On the western part of this section 2 was a fire all day. On the eastern part thereof was a fire between 4 and 5 o'clock. About 18 men were fighting fire on the northeast quarter of section 1 from noon to 3 o'clock on the day of the fire. Just west of the Work Farm in section 3 there was a fire at about 5 p. m. West of the Work Farm 2 and 3 miles were two fires in section 5-50-15 and section 36-51-15, that were burning between 11:30 and noon. There cannot be any doubt about the existence of such fires. On this dry windy day all fires grew rapidly. Fires in this vicinity were just as susceptible to wind influences as the railroad fire.

I have no sympathy with the assertion that after a fire has traveled 10 to 15 miles it is distinguishable from another that had its origin at a little or large supply of fuel. A fire started by a match is just as big after a few miles travel in a gale as a fire that started in all the fuel at Mile Post 62. The "initial impetus" was of no importance in the presence of the terrible wind that prevailed on this fateful day. It made all the small fires into big ones. This was inevitable.

Mrs. Kruger living on section 3-50-15 at 4 o'clock p. m. packed her stuff to move out because of fire. The railroad fire had crossed the river 16 miles away just 30 minutes earlier. It was not this fire that was threatening Mrs. Kruger who lived 8 miles from plaintiffs' home toward which her fire was traveling. At 6 o'clock a fire started in section 27-51-15 which could not be put out by the men there. It was 7 miles west and one mile north of plaintiffs' home. The wind was carrying it southeast. If the wind later turned it to the northeast it would carry it to the north of plaintiffs' home, from which direction the fire came that consumed it. At that hour the railroad fire was 15 miles away. In the northwest part of section 32-51-14 three miles west and one mile north of

plaintiffs' home was a fire which caused columns of smoke to rise at 4 o'clock p. m. In the south part of section 28-51-14, less than two miles northwest from plaintiffs' home, was a fire between 4 and 5 o'clock. At 5:30 p. m. a fire was quite near the McCool home, but to the northwest therefrom. This fire was on the southwest corner of section 35-51-14, and perhaps 70 rods from plaintiffs' home. Here buildings were burned. This was 3½ miles northeast of the Norman Dairy which burned at 6 p. m. The railroad fire was at Munger or Five Corners about 5 o'clock, traveling at 6 miles per hour reaching, apparently, Kimball's and Clark's about 7 o'clock. It could not have started this fire so near the McCool home at 5:30.

At 6:15 fire was encountered in section 35-51-14 about 100 rods almost due north of the McCool home. At the same hour fire was on the southwest corner of section 35-51-14 and 1¼ miles west and 70 rods north of the McCool home. The Duluth fire Department was fighting a fire in the north part of section 35-51-14 most of the afternoon and left it at 4:20 p. m. still burning. There were other fires mentioned in the prior opinion which we do not now specifically mention. One witness, McWhorton by name, at about 7 o'clock p. m. traveled the Howard Gnesen road from near the Golf Club where he saw fire, southerly along this road, thence southeasterly to the south line of sections 10 and 11 and then easterly into Boulevard avenue and then northerly up Woodland avenue to east Calvary road, making a horseshoe route with the calks to the north and with the McCool residence between the calks or heels and near the east one. This route to the west and south is more than a mile from this residence. There were no fires along this route at that time. Only a small portion of the territory in the horseshoe area was burned over and that was along the north edge only, showing conclusively that the fire burning this home did not reach it from the southwest.

Plaintiffs' home was burned by a fire coming from the north. They left their home by the back door to the south. No one has pointed out how the railroad fire could have reached the particular house. The presence of so many other fires, so near by, which were ready to consume everything in their course, under the anger of

a gale, is not only quite sufficient to account for the loss, but renders it highly improbable that the railroad fire is even a contributing cause of the loss. With this conviction I feel it my duty, because of the reasons stated here and in the prior opinion, to register my protest against liability being imposed by this record which I think is conjectural and speculative in the extreme. I regard the proof as insufficient.

QUINN, J. (concurring in dissent.)
I concur in the dissent of the Chief Justice.